**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 22-CR-100** |
| **HANEEF VAUGHN** | : | |
|    a/k/a "Haneef Ameen Vaughn-Wilson," | : | |
|    a/k/a "Hanef Vaughn," | : | |
|    a/k/a "Neef" | : | |

## GOVERNMENT'S MOTION FOR PRETRIAL DETENTION

Defendant Muhammad Ware has been charged by indictment with conspiracy in violation of 18 U.S.C. § 371, and dealing in firearms without a license in violation of 18 U.S.C. § 922(a)(1)(A) and 924(a)(1)(D). Defendants Haneef Vaughn and Jabreel Vaughn have each been charged with conspiracy in violation of 18 U.S.C. § 371. An analysis of the factors enumerated in 18 U.S.C. § 3142(g) demonstrates that defendant Haneef Vaughn should be detained pending trial.

Philadelphia is a city awash in illegal firearms. As fast as the men and women of local, state, and federal law enforcement recover these illegal guns, more seem to flood the streets taking their place. The relentless wave of gun violence that plagues our streets would be incapable of perpetuating itself, but for the consistent steady flow of illegal firearms. The defendants are charged with trafficking a total of 102 firearms to the Eastern District of Pennsylvania. Despite having a connection to the city of Philadelphia, and a knowledge of the violence that continues to grip so many of its neighborhoods, they chose to continue to pollute its streets with a disproportionate number of those illegal firearms. The actions of people like these defendants are

1

part of the engine that drives this violence. The carnage already wrought by the guns the defendants helped to inject onto the streets of Philadelphia and its surrounding counties almost defies description. Terrifyingly, the full legacy of those guns has not yet been fully written, as many have yet to be recovered. Still, the initial volume of recorded violence provides an ominous look into the future.

Because no condition or combination of conditions will reasonably assure the defendant's appearance as required and/or the safety of the community, the government moves pursuant to 18 U.S.C. §§ 3142(e) and (f) for a detention hearing and pretrial detention of defendant Haneef Vaughn.

## I.   FACTS

In support of this motion, the government makes the following representations and proposed findings of fact:

### A.   The Evidence In This Case

1.      There is probable cause to believe that the defendant Haneef Vaughn engaged in a conspiracy to make false statements to a federal firearms licensee, and dealing in firearms without a license in violation of 18 U.S.C. § 371, on the basis of the indictment returned on March 17, 2022.

2.      In 2020, members of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) began to notice a trend of firearms recovered in the city of Philadelphia, Pennsylvania that were originally purchased in the Myrtle Beach, South Carolina (Horry County) area and had short

"time to crime" windows.[1] The agents separately noted that several of the firearms were concentrated in a particular geographic area of Philadelphia.

3.      Agents eventually learned that defendant Ware had originally purchased several of these firearms in Myrtle Beach, South Carolina. In August 2020, an ATF Industry Operations Investigator reported that they were contacted by a FFL based in Myrtle Beach, South Carolina that refused to sell defendant Ware additional firearms after he purchased thirteen firearms on three occasions between August 18, 2020, and September 8, 2020, paying $11,000 in cash for the purchases.

4.      In November 2020, agents traveled to Myrtle Beach, South Carolina to conduct interviews and review firearm transaction records. In the course of that trip, the agents learned that defendant Ware had purchased in excess of 100 firearms, and that most of the purchases were made from a single FFL.

5.      Agents provided defendant Ware with his *Miranda* warnings and interviewed him in November 2020. During the interview, defendant Ware admitted to purchasing guns then selling them to make a profit. He initially acknowledged selling only a small portion of the firearms, but eventually admitted that he had sold all but the three firearms agents identified in his possession. In the interview, defendant Ware admitted using one of his co-conspirators/co-defendants, defendant Haneef Vaughn, to help broker the sales in Philadelphia, Pennsylvania. He denied using any other family to help him sell the firearms, and also denied being paid by anyone to purchase firearms on their behalf in violation of federal firearm laws.

---

[1] "Time to crime" is a term used by investigators which counts the number of days from which a firearm is purchased at a Federal Firearms Licensee ("FFL") until the day it is recovered in a crime by a law enforcement agency.

6.     At the conclusion of the interview, agents sought consent to search defendant Ware's cell phone for evidence of firearms trafficking. Agents provided, and defendant Ware signed, a written consent to search form.

7.     A review of the phone's contents refuted much of what defendant Ware claimed during his interview. The device contained numerous communications detailing the illegal purchase, sale, and delivery of firearms to both defendants Haneef Vaughn and Jabreel Vaughn and others in Philadelphia, Pennsylvania. The messages made plain that defendant Ware frequently was contacted by his co-defendants and others to purchase firearms for third parties in violation of federal firearm laws. Defendant Ware also sought out others and inquired whether they needed him to purchase firearms on their behalf. The contents also confirmed defendant Ware's frequent travel from South Carolina to the Philadelphia, Pennsylvania area nearly immediately or within days of the illegal purchases.

8.     The firearms recovered to date by law enforcement have been seized from individuals such as juveniles, and previously convicted felons. They have been recovered in the course of investigations ranging from illegal firearm possession to carjackings, non-fatal shootings, and homicides.

### B.     Maximum Penalties

The maximum sentence for the conspiracy count is five years imprisonment, and a fine. The maximum sentence for dealing firearms without a license is also five years' imprisonment, and a fine. Defendant Ware is thus facing a potential maximum sentence of ten years' imprisonment, and a fine. Defendants Haneef and Jabreel Vaughn are each facing a potential maximum sentence of five years imprisonment, and a fine.

C.      **Criminal History**

Defendant Ware is now 26 years old and has had contact with the criminal justice system in South Carolina since 2015. In 2015, defendant Ware was arrested for misdemeanor breach of trust with fraudulent intent. No disposition was available for that offense. In 2018, the defendant was again arrested for unlawful carrying of a weapon. Local prosecutors ultimately withdrew the matter.

Defendant Haneef Vaughn is now 25 years old and has had contact with the criminal justice system in Philadelphia at both the juvenile and adult levels. In 2008, defendant Haneef Vaughn was arrested as a juvenile for simple assault and related offenses, but was ultimately not adjudicated delinquent. In 2020, the defendant was arrested as an adult for aggravated assault and related offenses. He ultimately pled guilty to simple assault and is currently on probation.

Defendant Jabreel Vaughn is now 20 years old and has no known prior contact with the criminal justice system.

D.      **Defendants' Background**

Defendant Haneef Vaughn is a resident of Philadelphia, Pennsylvania. He reported working for Marriott Hotels during his initial appearance before the Court.

II.     **LEGAL ARGUMENT**

There are no conditions of release that will reasonably assure the appearance of defendant Haneef Vaughn or ensure the safety of the community. To determine whether such conditions exist, the Court is required to "take into account the available information concerning" four factors. 18 U.S.C. § 3142(g).  First, the court must examine the "nature and circumstances of the offense charged, including whether the offense is crime of violence … or involves a firearm." *Id.* §

3142(g)(1). Second, it must look at the "weight of the evidence against the person." *Id.* § 3142(g)(2). Third, it must examine the history and characteristics of the defendant. *Id.* § 3142(g)(3). Finally, it must weigh "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." *Id.* § 3142(g)(4). Each of these factors weigh in favor of detention.

### A.  Nature and Circumstances of the Offense

The first factor weighs most heavily in favor of detention. The defendants are charged with trafficking 102 firearms to the Eastern District of Pennsylvania, and a disproportionate number of those firearms were concentrated in deliveries to Philadelphia. In a city struggling with gun violence the magnitude of their conduct can hardly be described. The defendants were virtually indiscriminate in who they purchased or sold firearms for so long as the customer was willing and able  to line their pockets.

### *Defendant Muhammad Ware*

Defendant Ware's conduct in this case is egregious for a number of reasons. Defendant Ware completed the necessary training and coursework to obtain a South Carolina concealed weapons permit. He was someone the state of South Carolina believed would safely and properly handle a firearm. He rewarded that trust by using it to simply facilitate his firearm trafficking enterprise with his co-defendants since the permit entitled defendant Ware to waive the background check requirement most buyers would otherwise be required to complete. That he was seemingly identified as a responsible gun owner yet still chose to purchase and traffic so many firearms should serve as an aggravating factor.

There likewise can be no question that defendant Ware was repeatedly advised on the firearm transaction form that what he was doing was not legal. Any claim by the defendant that he acted in good faith when he purchased and sold the firearms at issue is incredible. Time and again, defendant Ware demonstrated that he was simply far more interested in continuing to make money. The Form 4473 that the defendant completed more than two dozen times contains an explicit warning noting when you are *not* considered the actual transferee/buyer of the firearm.[2] In the event the plain language of the form's warning proved confounding to the defendant, the form itself includes additional pages that have question-specific guidance on various portions of the form. The form goes so far as to include an actual example of when you are and are not considered the actual transferee/buyer. Nevertheless, time and again, defendant Ware signed under penalty of perjury that he was the actual buyer of the firearms then promptly sold them to other people including his co-defendants.

Even if the Court was inclined to give defendant Ware some benefit of the doubt as to his purported "misinterpretation" of the Form 4473's requirements, the circumstances of many of the purchases and sales totally undercut that claim. In the course of the period under indictment, defendant Ware sold firearms to people he knew or very easily should have known were not permitted to legally own or possess a firearm. For example, defendant Ware sold a number of guns to his cousin, who was fifteen to sixteen years old during the period under indictment. In another telling example, defendant Ware purchased 15 firearms in a *single* day, and 11 came from the

---

[2] The ATF Form 4473 notes at Question 21.a, "[…] **Warning: You are not the actual transferee/buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual transferee/buyer, the licensee cannot transfer the firearm(s) to you.** " (emphasis in original).

same FFL. In the store where he purchased 11 firearms, the defendant purchased 8 from the same manufacturer, and 5 of those 8 firearms were of the exact same model. In the second store, the defendant purchased 4 Glock firearms, and 3 were of an identical model. Six days later he returned to one of the same FFLs and purchased another 4 identical firearms. Few, if any, of defendant Ware's firearm purchases were of such a rare quality that they would warrant the marked-up price he subsequently charged to the eventual buyers. He obtained the high marked-up price because he was selling them illegally to people who were prohibited from buying guns through legitimate means.

The evidence in this case also gives a clear window into what defendant Ware was thinking, and what he understood the transactions to involve. Defendant Ware would frequently send text and picture messages to individuals, including his co-conspirators, about when he planned to go to a gun store, and what was inside. He referred plainly at times to the make, model, and caliber of firearms. Defendant Ware also often sent picture messages of firearms that he purchased, or firearms sitting inside display cases with rows of other guns. He then plainly spelled out in text messages what he purchased, and what the cost would be to the prospective buyer (e.g. "Mossberg 1,000 [dollars] cuz it got the beam. The Glock 1200 [dollars]. Brand new never touched in the box. Everything I get is brand new never used." [sic]. In another telling exchange, a party, after the defendant advised them that he had purchased "2 9mm, the glizzy [Glock] .22, a .45," asked the defendant to "send me the pics of them jawns" [sic] and the defendant sent a series of picture messages. The party eventually remarked "[t]hem jawns already sold [laughing emoticon]" and the defendant replied, "Ayooooo [laughing emoticons] [gorilla emoticons] that's the beauty of it."

Defendant Ware also made no secret that his scheme had developed into a "business." In a message to a friend requesting defendant Ware purchase him a personal Glock firearm, defendant Ware cautioned that, "Glocks the hardest gun to find, [n----s] waiting and waiting. Wenever they gettem I gotta take 10 up top" [sic]" When the associate stressed that it was "for me," defendant Ware reiterated, "I can get one, but not at least the next 5. This shit a business now bro." [sic]. Defendant Ware further underscored, that "[i]t got to the point where I tripled my fee Bc [n----s] wanna get guns off me and sell them for double." [sic].

The evidence also shows an unmistakable awareness that his conduct put him at risk with law enforcement. In one particular instance, when defendant Ware was arranging for the eventual delivery of several illegal firearms, a party identified a location in Philadelphia. The proposed location prompted defendant Ware to reply, "[w]tf bro I'm not comin up there at night [the] law be drawn round there." (i.e. the location had a regular/heavy police presence). In another exchange, the defendant told a contact, "[…] Sled been calling my peoples and they tell them I own my own private shop. Now sled off my ass. Other ppl would never do that shit" [sic].[3] When the contact cautioned defendant Ware to "[…] be careful" he replied, "I'm good, that's why you can't go everywhere. It's all about the ppl owner of the store. […] They only wanted to see wat I was doin with the guns. They told them I'm good ppl. It only took for them to say the wrong thing. And they didn't. So I'm straight. Bouts get my business and shit."

---

[3] The defendant's reference to "Sled"/"sled" likely refers to the **S**outh **C**arolina **L**aw **E**nforcement **D**ivision. Based on the timing of the remarks it appears that a party likely divulged to defendant Ware that ATF investigators had begun to inquire about his purchases and they misreported which agency had contacted them.

Defendant Ware was right to use the term business. When agents began to gather firearm transaction records in South Carolina, one FFL where defendant Ware purchased an overwhelming majority of the firearms he would traffic asked the agents whether they were looking for a particular name. The agents asked the FFL what he thought, and the party identified defendant Ware. The FFL reported that defendant Ware said his goal was to purchase 200 firearms. Despite claiming during his interview with ATF investigators a supposed uncertainty about where and to whom some of the guns were sold, he remarked in an October 2020 message, "I sold 74 this year so far." In addition, he did not even attempt to hide that the trafficking enterprise had essentially become a business in everything but name. In an August 2020 message, defendant Ware learned of a party purportedly infringing on one of his "customers." Defendant Ware wrote to the party, "[n]o way y'all really out here doin grimey shit, how u in philly by yaself delivering to my c[u]stomers bro." [sic]. In a separate August 2020 message to defendant Haneef Vaughn, defendant Ware noted, "[t]he ybs [young buls] around the corner from you is my custys [customers]. […]" [sic] Defendant Haneef Vaughn replied, "[t]hey waiting for you." In a particularly ironic reply given what they were selling, defendant Ware responded, "I'll be there Monday or Tuesday, I get my kids on the weekend. Let them know" [sic]. Defendant Ware also apparently sought to streamline the process and wrote to defendant Haneef Vaughn to, "[l]et me know how many they need, we can discuss a price before hand. So I just pull up and we on the same page" [sic].

The legacy of the guns the defendants polluted the streets with is perhaps the most horrifying aspect of this case. Those crime guns that have been recovered were found with juvenile and adult offenders alike. They have been found in the course of illegal firearm possession arrests,

carjacking investigations, shooting and homicide investigations. In one particularly harrowing example, a **_single_** firearm purchased by defendant Ware and trafficked to Philadelphia produced a **_24-page_** NIBIN Informational Lead report.[4] That single firearm was linked to **_eight_** separate crimes in Philadelphia in addition to its ultimate recovery during a PPD vehicle investigation: a homicide, two separate double non-fatal shootings, two separate non-fatal shootings, and three shooting incidents.[5]

The circumstances of the transactions themselves should have made it patently obvious to defendant Ware that the guns were all but certainly destined to become crime guns, but defendant Ware's communications themselves also show he was warned. In a June 2020 text message, defendant Ware, in the course of extolling the advantages/disadvantages between two types of firearms, explained why a party should choose one over the other. The party responded bluntly to defendant Ware, "bro we in philly not the navy we need something small that spit [shoots] we ain't tryna hit [n----s] a block away [laughing emoticon]" [sic]. In a July 2020 text message touting the money he recently made ("Wen I came up there I had 10[,000 dollars]...I got 13[,000 dollars] now" [sic]), a contact cautioned "yea keep going and slow down on selling them chumpys [guns] in ya name i'm telling you! [...] to just anybody" [sic]. Also in July 2020, a party contacted

---

[4] The National Integrated Ballistic Information Network (NIBIN)  compares images of submitted ballistic evidence from shooting scenes and recovered firearms and produces a list of possible similar results. A firearms examiner will conduct a microscopic examination of the actual physical evidence to confirm a NIBIN lead as a hit. A NIBIN hit occurs when two or more firearms ballistic evidence acquisitions are identified as a confirmed match by a firearms examiner. https://www.atf.gov/resource-center/fact-sheet/fact-sheet-national-integrated-ballistic-information-network

[5] In the arrest where the instant crime gun was recovered, one of the people in the car threw a bag out of the window of the vehicle that had two additional guns inside.

defendant Ware and asked him "[y]ou think you gon be able too bring me sum more jawns [guns] down here I got a lot of [n----s] who tryna buy sum" [sic]. For a moment, defendant Ware exercised a degree of judgment and cautioned, "[N---a] of course everyone want them, they gotta pass a background tho. You can't just give any [n---a] guns bro" [sic]. That moment of clarity proved fleeting. The party responded, "I'm not just giving any [n----s] guns I got real street [n----s] tryna buy them" and defendant Ware replied, "ard [alright] give me a couple days" [sic].

### *Defendant Haneef Vaughn*

Defendant Haneef Vaughn was an integral component of the firearms trafficking conspiracy. It would be all but impossible for much of the conduct in the indictment to have taken place without points of contact in Philadelphia. Defendant Ware, even with his familiarity with Philadelphia, could not realistically pull on to the streets of Philadelphia and hold open his doors like some form of traveling salesman with a trunk full of illegal firearms. The conspiracy required people like defendant Vaughn to verify defendant Ware's criminal bona fides to prospective buyers and streamline the transactions themselves. The relationship proved successful as the two conspired to traffic more than 30 illegal firearms.

Defendants Ware and Vaughn knew the demand for illegal guns in a city like Philadelphia was high, and they relied on parties like defendant Haneef Vaughn to help direct supply. The two repeatedly engaged in easy back and forths about parties looking to purchase illegal firearms, and what their particular requests might be. For example, in a September 2020 exchange with defendant Vaughn, defendant Ware sent a text message asking, "[N----s] need?" [sic] and, within seconds, defendant Vaughn replied, "Yup hold on" [sic]. Approximately five minutes later,

defendant Vaughn told defendant Ware, "2 glocks and you can get whatever after that" [sic]. Defendant Ware sent a picture message of a firearm and said  "I got 2 of these fns [FN brand firearms] […] [s]omebody just bought last glock" [sic] and defendant Vaughn replied, "[a]rd [alright] bet get whatever" [sic]. Later that same day defendant Ware checked in with defendant Vaughn and asked, "[a]ny word?" and defendant Vaughn told him, "I'm waiting for all them to text back" [sic]. After defendant Vaughn made a query about a particular type of firearm, defendant Ware advised "[t]hey don't sell those down here" then quipped, "[t]his gun shit gettin different, shit goin up like weed" and defendant Vaughn replied, "I know" [sic].

Separately, in an October 2020 exchange with defendant Vaughn, defendant Ware sent a series of text and picture messages describing the latest illegal firearms he sought to sell. Defendant Vaughn asked, "[h]ow many you bringing […] [a]nd how much you want for them" [sic]. Defendant Ware replied, "[…] 13[00] for Glocks, 11[00] for [S]mith and Wesson" then sent two Internet search images of those firearm brands with the message "[t]hat color.. and black" [sic]. Defendant Ware asked defendant Vaughn, "[t]hem [n----s] gone be up? Or the am?" and defendant Vaughn replied, "[t]hey gonna be up [n----s] don't go to sleep" [sic]. Defendant Ware asked defendant Vaughn, "[u] sent out pics?" and defendant Vaughn replied "[n]ah [I] just told what [i]t was" [sic]. Defendant Ware asked "[w]at they say?" and defendant Vaughn reported back "[t]hat's what [n----s] want" [sic]. Later he reassured defendant Ware, "[t]hey all sold for you once you get here" [sic].

Defendant Vaughn, like defendant Ware, also cannot reasonably argue to the Court that he believed his transactions with defendant Ware were proper. Defendant Vaughn applied for a

Pennsylvania license to carry firearms that was ultimately denied.[6]  One cannot simultaneously claim to be knowledgeable enough or qualified to carry a concealed weapon, but then ignore the obvious warning signs about the nature of the transactions he participated in with defendant Ware.

### Defendant Jabreel Vaughn

Defendant Jabreel Vaughn was likewise an essential participant in the trafficking conspiracy. Like defendant Haneef Vaughn, he was a necessary gatekeeper that allowed defendant Ware access to local customers. The relationship with defendant Ware again proved successful as the two conspired to traffic at least 25 illegal firearms.

Defendant Jabreel Vaughn and defendant Ware exchanged numerous communications about the purchase, sale, and delivery of illegal firearms. The substance of the communications plainly detailed their transactions. For example, in a July 2020 message between defendant Ware and defendant Vaughn, Ware asked Vaughn for "the info" and Vaughn replied "[m]y name" [sic]. Defendant Ware clarified "[t]he code [n---a]" and defendant Vaughn sent a picture message of a money order receipt for more the $2,500 and the "Sender Information" reflected "Jabreel Azeem Vaughn" and the "Recipient" listed was "Muhammad Ware." Later the same day, defendant Ware sent "[$]800+[$]699+[$]650" and defendant Vaughn replied, "[f]or what?" Defendant Ware responded "Hell cat (just got shipped being processed) Springfield XDE (cake hour ago) Walther PP5" [sic]. Lest there be some confusion about the plain language of the messages, defendant Ware sent Vaughn two picture messages of the same three firearms referenced in the messages. The Walther firearm would go on to be recovered by members of the Philadelphia Police Department

---

[6] He cited the reason for the application as "self defense."

in 2021 in the possession of an individual who had been convicted twice for illegal firearm possession. Investigators found the trafficked gun inside a safe with a second gun inside. That second gun was reported stolen the year prior.

Defendant Vaughn frequently photographed the illegal firearms that were trafficked from South Carolina. Defendant Ware purchased a series of firearms on July 17, 2020. Defendant Vaughn's cell phone contained photos dated July 18, 2020, of firearms consistent with the make and model of defendant Ware's purchases. One of those firearms in particular went on to be recovered by members of the Pennsylvania Office of Attorney General and U.S. Marshal's Service Violent Crimes Fugitive Task Force on July 27, 2020, a mere 10 days after defendant Ware purchased the firearm. That individual was the subject of an active federal arrest warrant and was a suspect in a homicide in Delaware County, Pennsylvania at the time of their arrest. They subsequently confessed their involvement and were charged with murder and related offenses. In the course of the same statement they also admitted to possessing the trafficked firearm that was recovered and claimed they "bought it off a person I met."

Defendant Vaughn likewise cannot claim any form of youthful inexperience to justify his actions. In a June 2020 message, defendant Ware wrote to defendant Vaughn, "I made too much money yesterday bro I think this is a dream" [sic] and defendant Vaughn replied, "[f]acts [laughing emoticons] gotta do it again" [sic]. In a September 2020 message, a contact asked defendant Vaughn if it would "be illegal to build my own glock […] [a] ghost Jawn" [sic]. Defendant Vaughn replied, "yeah [laughing emoticons] having a Glock is illegal for u period."

15

Tellingly, defendant Vaughn also sought to limit investigators' access to incriminating evidence. Following the execution of federal search warrants, investigators' seized defendant Jabreel Vaughn's cell phone. Numerous text and picture messages between defendant Ware and defendant Vaughn were recovered from defendant Ware's device, but defendant Vaughn had notably deleted his communications with Ware. In addition, he utilized the encrypted messaging application Telegram in an attempt to subvert monitoring or recovery of the communications by law enforcement. In July 2020, defendant Vaughn wrote to defendant Ware, "[n----s] need jawns [guns] brodie can we do business [eye-rolling emoticon]" [sic]. Defendant Vaughn followed up and told defendant Ware "[s]ending 25[00] […] [m]atter of fact we only gonna talk on [T]elegram bout bidness bro" and he sent defendant Ware an "invite" to the application. Defendant Vaughn also sent an "invite" to a contact in August 2020. When the contact replied "Fuck is this [laughing emoticons]" [sic] defendant Vaughn replied, "Breel." The party responded "but I'm sayin the app" [sic] and defendant Vaughn replied, "[n]ah if u only speak to people u need to the feds can't see shit and can delete msgs for both sides" [sic].

### B. Weight of the Evidence

The second factor also weighs in favor of detention because, as explained above, the evidence against the defendant is strong. Some of the most compelling evidence in this case is the written words of the defendants themselves. The defendants exchanged requests for the purchase, sale, and delivery of firearms as freely as someone asking a friend if they wanted something from a store they planned to visit.

The communications are frank and at times completely unmistakable in their criminal nature. Indeed, defendant Ware in particular frequently confirmed with parties about whether they

were sure about the requested purchases and stressed that he did not want to spend his money unless they were certain a subsequent sale would be made.

### C. History and Characteristics of the Defendants

Defendant Ware and defendant Haneef Vaughn's past contact with law enforcement has not deterred either from continuing to commit crimes. Instead, it argues again in favor of detention. Each has demonstrated that he can live a law-abiding lifestyle when he chooses to do so. Their actions in this case are even more so the product of calculated and deliberate choices to engage in criminal conduct.

Defendant Ware was previously employed in hourly-wage positions. Those jobs are no doubt difficult, and often do not fairly compensate the workers for the amount and nature of the work. Defendant Ware simply found that it was far more lucrative to illegally sell guns than it was to actually work for a living.

Defendant Haneef Vaughn and defendant Jabreel Vaughn were also each capable of gainful employment, if they chose to do so. Instead, they chose to participate in more lucrative and criminal conduct.

### D. Danger to the Community & Risk of Flight

The danger inherent in firearms trafficking can hardly be overstated. Illegal firearms are at the heart of Philadelphia's gun violence epidemic. That each of the defendants has longstanding ties to Philadelphia, and an awareness of the gun violence gripping the city, but nevertheless chose to engage in this criminal conduct shows a callous disregard for the citizens of Philadelphia.

While each of the defendants have relatively few or no criminal contacts, they are each nevertheless a danger to the community. The defendants, individually and collectively, serve as prime examples of the truly insidious nature of firearms trafficking. On the one hand, they have the benefit of holding out their relatively minimal criminal contacts, and any past employment experiences. But those traits are the very same ones that allowed them to commit these offenses in the first place. Were any of the defendants the owners of lengthy criminal histories they would have simply been rebuffed (or should have) when they attempted to purchase a gun. The defendants should not be able to flaunt the positive aspects of their histories, then use that same history to flout the law and be deemed any less dangerous.

The growing footprint of the crime guns they trafficked into the community also demonstrates how and why they are a danger to the community. Only 23 of the more than 100 firearms charged in the indictment have been recovered as crime guns to date. The legacy of the balance of those guns, shockingly, can only realistically get worse. Defendant Haneef Vaughn and his co-defendants cannot repeatedly disperse firearms into the criminal stream of commerce then keep themselves at arms-length from what people do with those guns. Their actions were a necessary component in the firearms becoming crime guns and they cannot distance themselves from the entirely foreseeable consequence of their actions.

The majority of the transactions in this case were completed with cash. As a result, defendant Haneef Vaughn and his co-conspirators have potentially unverifiable cash reserves at their disposal that could facilitate their flight from the jurisdiction, out of the view of law enforcement. Evidence developed in the investigation also showed that defendant Haneef Vaughn

traveled to Egypt in connection with his participation on an amateur sports team. He is thus familiar with international travel and would know what is needed and how to flee.

## III.   **CONCLUSION**

The evidence in this case is strong and the allegations are serious. Defendant Haneef Vaughn faces a lengthy period of incarceration should he be convicted. That reality provides ample incentive for the defendant to flee should he be released.   No condition or combination of conditions other than pretrial detention will reasonably assure the presence of the defendant as required and the safety of the community.

WHEREFORE, the government respectfully submits that its Motion for Defendant's Pretrial Detention should be granted.

Respectfully submitted,

JENNIFER ARBITTIER WILLIAMS
United States Attorney


/s/ Martin E. Howley, Jr.
MARTIN E. HOWLEY, JR.
Special Assistant United States Attorney


MARK S. MILLER
Assistant United States Attorney

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| **v.** | **:** | **CRIMINAL NO. 22-CR-100** |
| **HANEEF VAUGHN** | **:** | |
| **a/k/a "Haneef Ameen Vaughn-** | | |
| **Wilson,"** | **:** | |
| **a/k/a "Hanef Vaughn,"** | | |
| **a/k/a "Neef"** | **:** | |

## <u>PRETRIAL DETENTION ORDER</u>

AND NOW, this _____ day of _____, 2022, after an evidentiary hearing and argument of counsel for the government and the defendant, the Court finds that:

(a)   the government has proved by a preponderance of the evidence that no condition or combination of conditions will reasonably assure the appearance of the defendant as required; and

(b)   the government has proved by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of other persons and the community, as required by Title 18, United States Code, Section 3142(e).

The Court makes the following findings of fact:

This case is appropriate for detention under Title 18, United States Code, Section 3142(e) because:

1.      There is probable cause to believe that the defendant Haneef Vaughn engaged in a conspiracy to make false statements to a federal firearms licensee, and dealing in firearms without a license in violation of 18 U.S.C. § 371, on the basis of the indictment returned on March 17, 2022.

2.      In 2020, members of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) began to notice a trend of firearms recovered in the city of Philadelphia, Pennsylvania that were originally purchased in the Myrtle Beach, South Carolina (Horry County) area and had short "time to crime" windows.[7] The agents separately noted that several of the firearms were concentrated in a particular geographic area of Philadelphia.

3.      Agents eventually learned that defendant Ware had originally purchased several of these firearms in Myrtle Beach, South Carolina. In August 2020, an ATF Industry Operations Investigator reported that they were contacted by a FFL based in Myrtle Beach, South Carolina that refused to sell defendant Ware additional firearms after he purchased thirteen firearms on three occasions between August 18, 2020 and September 8, 2020, paying $11,000 in cash for the purchases.

4.      In November 2020, agents traveled to Myrtle Beach, South Carolina to conduct interviews and review firearm transaction records. In the course of that trip, the agents learned that defendant Ware had purchased in excess of 100 firearms, and that most of the purchases were made from a single FFL.

---

[7] "Time to crime" is a term used by investigators which counts the number of days from which a firearm is purchased at a Federal Firearms Licensee ("FFL") until the day it is recovered in a crime by a law enforcement agency.

5.      Agents provided defendant Ware with his *Miranda* warnings and interviewed him in November 2020. During the interview, defendant Ware admitted to purchasing guns then selling them to make a profit. He initially acknowledged selling only a small portion of the firearms, but eventually admitted that he had sold all but the three firearms agents identified in his possession. In the interview, defendant Ware admitted using one of his co-conspirators/co-defendants, defendant Haneef Vaughn, to help broker the sales in Philadelphia, Pennsylvania. He denied using any other family to help him sell the firearms, and also denied being paid by anyone to purchase firearms on their behalf in violation of federal firearm laws.

6.      At the conclusion of the interview, agents sought consent to search defendant Ware's cell phone for evidence of firearms trafficking. Agents provided, and defendant Ware signed, a written consent to search form.

7.      A review of the phone's contents refuted much of what defendant Ware claimed during his interview. The device contained numerous communications detailing the illegal purchase, sale, and delivery of firearms to both defendants Haneef Vaughn and Jabreel Vaughn and others in Philadelphia, Pennsylvania. The messages made plain that defendant Ware frequently was contacted by his co-defendants and others to purchase firearms for third parties in violation of federal firearm laws. Defendant Ware also sought out others and inquired whether they needed him to purchase firearms on their behalf. The contents also confirmed defendant Ware's frequent travel from South Carolina to the Philadelphia, Pennsylvania area nearly immediately or within days of the illegal purchases.

8.      The firearms recovered to date by law enforcement have been seized from individuals such as juveniles, and previously convicted felons. They have been recovered in the

course of investigations ranging from illegal firearm possession to carjackings, non-fatal shootings, and homicides.

7.      The maximum sentence for the conspiracy count is five years imprisonment, and a fine. The maximum sentence for dealing firearms without a license is also five years' imprisonment, and a fine. Defendant Ware is thus facing a potential maximum sentence of ten years' imprisonment, and a fine. Defendants Haneef and Jabreel Vaughn are each facing a potential maximum sentence of five years imprisonment, and a fine.  Accordingly, the defendant has a substantial incentive to flee.

8.      Any employment or family and community ties have proven insufficient to deter the defendant's criminal activity.

9.      The strength and nature of the case against the defendant, combined with the strong likelihood that the defendant will be incarcerated for a significant period of time increases the high risk that the defendant will not appear as required by the Court and evidences the danger he poses to the community.

Therefore, IT IS ORDERED that the defendant be committed to the custody of the Attorney General for confinement in a correction facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal; that the defendant be afforded reasonable opportunity for private consultation with counsel; and that, on order of a Court of the United States, or on request of an attorney for the government, the person in charge of the corrections facility in which the defendant is confined deliver the defendant to a United States Marshal for the purpose of an appearance in connection with a court proceeding.

BY THE COURT:

_____
HONORABLE CAROL SANDRA MOORE WELLS
United States Magistrate Judge

<u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the Government's Motion for Pretrial Detention and Proposed Order was served by electronic mail, on the following defense counsel:

Rossman Thompson, Esq.
601 Walnut Street
Suite 540 West
Philadelphia, PA 19106


*<u>/s/ Martin E. Howley, Jr.</u>*
MARTIN E. HOWLEY, JR.
Special Assistant United States Attorney


Date:   <u>April 7, 2022</u>